**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

JANE DOE,                                                    Case No.: 21-cv-1232

                 Plaintiff,

       -against-


LONG ISLAND MOTORS, INC., and DAVID
DELVECCHIO, *individually*,

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION
FOR DEFAULT JUDGMENT**


Dated: Garden City, New York
       October 25, 2021


**PHILLIPS & ASSOCIATES,**
**ATTORNEYS AT LAW, PLLC**
Joshua Friedman, Esq.
*Attorneys for Plaintiff*
585 Stewart Avenue, Suite 410
Garden City, New York 11530
(212) 248-7431

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT .................................................................................................. 1

PROCEDURAL HISTORY ....................................................................................................... 1

STATEMENT OF FACTS ......................................................................................................... 1

ARGUMENT ............................................................................................................................. 5

   I.    DEFAULT JUDGMENT IS WARRANTED ................................................................. 5

   II.   DEFENDANTS' LIABILITY IS READILY ESTABLISHED ..................................... 6

     A.   Hostile Work Environment ....................................................................................... 7

   III.   DAMAGES ...................................................................................................................... 8

     A.   Back Pay ..................................................................................................................... 9

     B.   Emotional Damages ................................................................................................ 11

     C.   Attorneys' Fees and Costs ...................................................................................... 13

       i.   Reasonable Hourly Rate ...................................................................................... 13

       ii.  Number of Hours Reasonably Expended .......................................................... 16

       iii. Costs ..................................................................................................................... 18

CONCLUSION ........................................................................................................................ 18

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) .................................................................. 8

*Bautista v. ABC Corp*, No. 19-cv-3963, 2021 U.S. Dist. LEXIS 62965 (S.D.N.Y. Mar. 31, 2021) ........... 6

*Becerril v. E. Bronx NAACP Child Dev. Ctr.*, No. 08-cv-10283, 2009 U.S. Dist. LEXIS 76376 (S.D.N.Y. Aug. 18, 2009) ......................................................................................... 10

*Bricklayers & Allied Craftworkers Local 2 v. Moulton Masonry & Constr., LLC*, 779 F.3d 182 (2d Cir. 2015) ............................................................................................................... 9

*Bricklayers v. Allied Craftworkers Local 2 v. Moulton Masonry & Constr., LLC*, 779 F.3d 182 (2d Cir. 2015) ............................................................................................................... 7

*Bridge Oil Ltd. v. Emerald Reefer Lines, LLC*, No. 06-cv-14226, 2008 U.S. Dist. LEXIS 107062 (S.D.N.Y. Oct. 24, 2008) .......................................................................................... 7

*Cement & Concrete Workers Dist. Council Welfare Fund v. Metro Found. Constrs. Inc.*, 699 F.3d 230 (2d Cir. 2012) ............................................................................................... 9

*DeCurtis v. Upward Bound Int'l, Inc.*, No. 09-cv-5378, 2011 U.S. Dist. LEXIS 114001 (S.D.N.Y. Sept. 27, 2011) .................................................................................... 11, 13, 14

*Fisher v. Mermaid Manor Home for Adults, LLC*, 192 F. Supp. 3d 323 (E.D.N.Y. 2016) ........................ 9

*Hamza v. Saks Fifth Ave., Inc.*, No. 07-cv-5974, 2011 U.S. Dist. LEXIS 139132 (S.D.N.Y. Dec. 5, 2011) ................................................................................................................. 10

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993) .................................................................. 8

*Little v. NBC*, 210 F. Supp. 2d 330, 388 (S.D.N.Y. Apr. 22, 2002) ................................................. 8

*Mack v. Otis Elevator Co.*, 326 F.3d 116 (2d Cir. 2003) ............................................................. 7

*Maher v. Alliance Mortg. Banking Corp.*, No. 06-cv-5073, 2010 U.S. Dist. LEXIS 145707 (E.D.N.Y. Aug. 9, 2010) ........................................................................................... 11

*Millea v. Metro-North R.R.*, 658 F.3d 154 (2d Cir. 2011) ........................................................... 14

*Moore v. Houlihan's Rest., Inc.*, No. 07-cv-3129, 2011 U.S. Dist. LEXIS 64452 (E.D.N.Y. May 10, 2011) ................................................................................................................. 10

*Noel v. N.Y. State Office of Mental Health Cent. N.Y. Psychiatric Ctr.*, 697 F.3d 209 (2d Cir. 2012)....... 10

*Patterson v. Balsamico*, 440 F.3d 104 (2d Cir. 2006) ................................................................ 13

*Rasmy v. Marriott Int'l Inc.*, 952 F.3d 379 (2d Cir. 2020) ........................................................... 8

*Rodriguez v. Almighty Cleaning, Inc.*, 784 F. Supp. 2d 114 (E.D.N.Y. 2011) ..................................... 7

*Santana v. Latino Express Rests., Inc.*, 198 F. Supp. 3d 285 (S.D.N.Y. 2016) .................................... 7

*Shah v. New York State Dep't of Civ. Serv.*, 168 F.3d 610 (2d Cir. 1999) ......................................... 6

*Sooroojballie v. Port Auth. of N.Y. & N.J.*, No. 15-cv-1230, 2020 U.S. Dist. LEXIS 174941 (E.D.N.Y. Sept. 22, 2020) ........................................................................................... 16

*United States Football League v. National Football League*, 887 F.2d 408 (2d Cir. 1989)...................... 20

*Watson v. E.S. Sutton, Inc.*, No. 02-cv-2739, 2005 U.S. Dist. LEXIS 31578 (S.D.N.Y. Sept. 6, 2005) .... 12

**Statutes**

28 U.S.C. § 1331 ............................................................................................................ 1

28 U.S.C. § 1367 ............................................................................................................ 1

42 U.S.C. § 2000e-5(g)(1) ............................................................................................... 10

42 U.S.C. § 2000e-5(k) ................................................................................................... 13

New York City Human Rights Law § 8-502(a) ........................................................................ 10

New York City Human Rights Law § 8-502(g) ........................................................................ 13

New York State Human Rights Law § 297(9) .......................................................................... 10

**Other Authorities**

Armen H. Merjian, *Nothing "Garden Variety" About It: Manifest Error and Gross Devaluation in the Assessment of Emotional Distress Damages*, 70 Syracuse L. Rev. 689 (2020)......................................12

## PRELIMINARY STATEMENT

Plaintiff, Jane Doe ("Plaintiff") respectfully submits this Memorandum of Law in support of Plaintiff's Motion for Default Judgment against Defendants Long Island Motors, Inc. ("LIM"), and David Delvecchio ("Delvecchio") (collectively "Defendants") on Plaintiff's claims of sex discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), sex discrimination under the New York State Human Rights Law ("NYSHRL") and gender discrimination under the Suffolk County Human Rights Law ("SCHRL").   To wit, Plaintiff was sexually harassed by Defendants.  For the reasons set forth herein, default judgment on all of Plaintiff's claims is proper and judgment should be entered against Defendants in the amount of $224,226.66.

## PROCEDURAL HISTORY

On March 8, 2021, Plaintiff began this action by filing the Complaint.[1] Contemporaneously with the filing of the Complaint, Plaintiff filed a motion to proceed under the pseudonym Jane Doe, which was granted by the Court on August 2, 2021.  On March 16, 2021, Plaintiff served both Defendants with the Summons and Complaint in this action.  Defendants failed to answer or otherwise appear in this action and Plaintiff requested a Certificate of Default from the Clerk on June 25, 2021.  On June 30, 2021, the Clerk signed and entered a Certificate of Default, certifying the default of Defendants.

## STATEMENT OF FACTS

In or around May 17, 2020, after having applied for a position with LIM on Craigslist, Plaintiff received a phone call inviting her to interview with Defendant Delvecchio. (Compl. ¶ 11). The following day, Plaintiff met with Defendant Delvecchio for the interview. (Compl. ¶ 12). As

---

[1] The Court has federal question jurisdiction over this case as it is brought pursuant to 42 U.S.C. § 2000(e), *et seq.*  28 U.S.C. § 1331.  The Court has supplemental jurisdiction over Plaintiff's state and city law claims pursuant to 28 U.S.C. § 1367.

Plaintiff was sitting down, her purse accidently tugged onto her blouse, pulling it up and revealing a portion of a tattoo on her stomach. (Compl. ¶ 13). Immediately, Delvecchio zoned in on Plaintiff's tattoo and said "Wow, you have nice tattoos, can I see them all?" (Compl. ¶ 14). As she had traveled a long way to get to the dealership and needed the job, Plaintiff simply chuckled, trying to brush it off, and sat down. (Compl. ¶ 14).

Plaintiff was ultimately hired by Defendants and on May 22, 2020, she began working as a sales specialist, earning a weekly salary of $200.00 plus commission and bonus, totaling $1,200 per week. (Compl. ¶ 15). On her first day, May 22, 2020, Plaintiff approached Joanne Peppaceno ("Peppaceno"), the finance supervisor, to discuss her concerns regarding her lack of experience. (Compl. ¶ 16). In response, Peppaceno assured Plaintiff that she had nothing to worry about, that she would receive training and assistance and invited Plaintiff to come to her with any questions. (Compl. ¶ 16). In the course of her conversation with Peppaceno, Plaintiff asked Peppaceno if she could keep an eye on Defendant Delvecchio because he "creeped her out." Instantly, Peppaceno exclaimed, "I always knew he liked black girls!" (Compl. ¶ 17). Peppaceno guaranteed Plaintiff that she would look after her and that there was nothing to worry about. (Compl. ¶ 17).

On one occasion when Delvecchio summoned Plaintiff into his office, Plaintiff noticed that Delvecchio had a panel of screens behind his desk displaying the video feeds of surveillance cameras throughout the dealership. (Compl. ¶ 20). Plaintiff looked over and saw a screen which appeared to show a camera facing her desk. (Compl. ¶ 21). Plaintiff was extremely distressed upon discovering the camera directed at her desk and, as a result, Plaintiff began to wear a hat to work, aware that Delvecchio was leering at her from his office. (Compl. ¶ 22). However, Delvecchio forbade Plaintiff from wearing a hat in the workplace and Plaintiff was only able to wear a hat for several hours. (Compl. ¶ 23). In or around early June 2020, Delvecchio's sexual attention became

more explicit when he told Plaintiff, "If I were given the chance, I would go down on you." (Compl. ¶ 28). Extremely uncomfortable, Plaintiff responded with a joke in an attempt to alleviate the situation. (Compl. ¶ 24).  Plaintiff contemporaneously disclosed to another co-worker, Jemima, that Delvecchio told her, a few weeks prior, "If I were given the chance, I would go down on you." (Compl. ¶ 28).

On or about June 15, 2020, Jemima stated to Plaintiff and other co-workers: "…tell everyone how you told me David has been hitting on you, tell them what you told me on Saturday!" (referring to Delvecchio's comment that he wanted to "go down on' Plaintiff") (Compl. ¶ 30). Delvecchio heard the exchange and called Plaintiff into his office and anxiously asked her, "What are you saying around here about me? You're telling people I want to take you out?" (Compl. ¶ 31). Plaintiff was afraid to explain to Delvecchio how she really felt because she was concerned that she might lose her job. (Compl. ¶ 32). Delvecchio continued to probe Plaintiff for details and asked, "What are you saying to people? Everyone here has a problem with you. Joanne is through with you and if you have issues with Jemima, I will fire you before I fire her." Delvecchio then dismissed Plaintiff from his office. (Compl. ¶ 33).

That following day, when Plaintiff arrived at work, she was called into a meeting with the entire staff by Delvecchio. (Compl. ¶ 34). The meeting appeared designed to attack Plaintiff as several of her co-workers made personal comments towards Plaintiff. (Compl. ¶ 35).  Having been beaten down, Plaintiff felt so defeated that all she could do was apologize and tell her colleagues that she wanted to put it all behind her and move forward. (Compl. ¶ 36).

Later that day, as Plaintiff was about to leave, Delvecchio called Plaintiff into her office. (Compl. ¶ 37). When she entered, Delvecchio brought up the meeting earlier that day and asked Plaintiff what she was telling people. (Compl. ¶ 38).  Delvecchio then told Plaintiff to sit down

and said, "so you like me?" while he unzipped his pants, pulled out his penis and began to stroke it. (Compl. ¶ 40). His penis in his hand, Delvecchio demanded that Plaintiff come over to his side of the desk. (Compl. ¶ 41). Plaintiff was terrified as she did not know how she was going to escape the situation. When Plaintiff walked over to his side of the desk, Delvecchio said, "Baby tell me what you want." Plaintiff pleaded that she just wanted her job. (Compl. ¶ 43).

Delvecchio then began to rub Plaintiff's butt with his left hand as he continued to stroke his penis with his right hand. (Compl. ¶ 44). Plaintiff exclaimed, "What are you doing, I can't have sex with you! I can't give you head! I can't do anything sexual with you." (Compl. ¶ 45). In a further attempt to extricate herself from the situation, Plaintiff told Delvecchio that she was on her period. (Compl. ¶ 46). Delvecchio responded that he did not care. (Compl. ¶ 46). At that point, Delvecchio stopped stroking his penis but only to grab Plaintiff's hand and place it onto his penis, forcibly stroking his penis with Plaintiff's hand. (Compl. ¶ 47). Delvecchio took his other hand and placed it inside of Plaintiff's pants, digitally penetrating Plaintiff's anus while he asked her if she "liked it." (Compl. ¶ 48). Plaintiff felt powerless as Delvecchio sexually assaulted her, desperately hoping it would end soon. (Compl. ¶ 49). Within a few seconds, Delvecchio ejaculated in Plaintiff's hand. (Compl. ¶ 49). Fearing for her safety if she acted in the manner she wished, Plaintiff calmly walked out, gathered her belongings and went to the restroom where she promptly vomited. (Compl. ¶ 50). Plaintiff felt degraded, horrified, nauseated, and repulsed. (Compl. ¶ 51).

Several days later, on June 19, 2020, Peppaceno approached Plaintiff to discuss the meeting from the previous week. (Compl. ¶ 52). As they were discussing the details from the meeting, Plaintiff mentioned to Peppaceno that Delvecchio had earlier told her that he could report her on account of how she had yelled at Plaintiff in front of customers weeks prior. (Compl. ¶ 53). Delvecchio interrupted the conversation between Plaintiff and Peppaceno and directed Plaintiff to

take his daughter's car for inspection. (Compl. ¶ 54). When Plaintiff returned, she saw Delvecchio and Peppaceno in a heated argument. (Compl. ¶ 55). Delvecchio yelled out to Plaintiff, "Come in here!" (Compl. ¶ 56). Plaintiff walked over to Delvecchio and Peppaceno, and Delvecchio screamed at Plaintiff, "You told Joanne I wanted to report her, you are a liar, all you do is run your mouth, I don't want you working here anymore!" (Compl. ¶ 57). As Plaintiff was gathering her belongings to walk out Delvecchio yelled, "I will fuck your background up, I will make sure you never work for another company again!" (Compl. ¶ 58). Plaintiff was humiliated and quickly walked out of the dealership. (Compl. ¶ 59).

## ARGUMENT

## I.    DEFAULT JUDGMENT IS WARRANTED

Rule 55 of the Federal Rules of Civil Procedure provides for entry of a judgment by default "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules." Fed. R. Civ. P. 55(a); *see Fashiontv.com, GMBH v. Hew*, 2007 U.S. Dist. LEXIS 52045 at *3. Pursuant to Fed. R. Civ. P. 55(b)(2), except in cases in which "the plaintiff's claim is for a sum certain or a sum that can be made certain by computation" (see Rule 55(b)(1)), "the party must apply to the court for a default judgment." The determination of a motion for default judgment is left to the sound discretion of the district court. *See Shah v. New York State Dep't of Civil Serv.*, 168 F.3d 160, 610, 615 (2d Cir. 1999).

In determining whether to grant a motion for default judgment, courts "first consider three factors: (1) whether the defendant's default was willful; (2) whether defendant has a meritorious defense to plaintiff's claims; and (3) the level of prejudice the non-defaulting party would suffer as a result of the denial of the motion for default judgment." *Bautista v. ABC Corp*, No. 19-cv-3963, 2021 U.S. Dist. LEXIS 62965, at *4 (S.D.N.Y. Mar. 31, 2021) (internal quotations omitted).

The district court has wide discretion as to whether to grant default judgment.  *See Shah v. New York State Dep't of Civ. Serv.*, 168 F.3d 610, 615 (2d Cir. 1999).

Here Defendants' actions were undoubtedly willful.  Despite being served with Plaintiff's Summons and Complaint on March 16, 2021, Defendants failed to file an Answer with the court by April 6, 2021, as required by Federal Rule of Civil Procedure 12(a). Moreover, on June 25, 2021, over three months after being duly served with process, Defendants still had not made any attempt to answer Plaintiff's claims. This further indicates Defendants' intentional decision not to appear or otherwise defend this action.  Under such circumstances, it is easy to conclude that Defendants' default was willful.  *See Rodriguez v. Almighty Cleaning, Inc.*, 784 F. Supp. 2d 114, 123-24 (E.D.N.Y. 2011) (collecting cases and finding willful default where defendants failed to communicate about the case).

Defendants' failure to file of an Answer to Plaintiff's Complaint leaves Defendants virtually bereft of any meritorious defense in the context of a default motion.  This is particularly true as the final factor weighs in favor of granting judgment to Plaintiff as denial of Plaintiff's motion would leave her with "no additional steps to available to secure relief in this Court." *Bridge Oil Ltd. v. Emerald Reefer Lines, LLC*, No. 06-cv-14226, 2008 U.S. Dist. LEXIS 107062, at *5 (S.D.N.Y. Oct. 24, 2008).  Given Defendants' willful default and the potential prejudice to Plaintiff in denying this motion, the Court should grant default judgment.

## II.    DEFENDANTS' LIABILITY IS READILY ESTABLISHED

Once a court is satisfied that default judgment is warranted, a court next considers whether the facts pled by the plaintiff establish the defendant's liability.  *See Santana v. Latino Express Rests., Inc.*, 198 F. Supp. 3d 285, 291 (S.D.N.Y. 2016).  In making this consideration, the factual

allegations set forth in the complaint are taken as true.  *See Bricklayers v. Allied Craftworkers Local 2 v. Moulton Masonry & Constr., LLC*, 779 F.3d 182, 187 (2d Cir. 2015).

### A.  Hostile Work Environment

To prevail on a hostile work environment claim under Title VII at the relevant time herein, the trier of fact must conclude "that the workplace was permeated with discriminatory intimidation that was sufficiently severe **_or_** pervasive to alter the conditions of [plaintiff's] work environment[.]"  *Mack v. Otis Elevator Co.*, 326 F.3d 116, 116 (2d Cir. 2003).  Proving the existence of a hostile work environment involves showing both "objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (internal quotations omitted).  In determining whether a workplace is hostile, one should look at the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Little v. NBC*, 210 F. Supp. 2d 330, 388 (S.D.N.Y. Apr. 22, 2002) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). So long as there is some basis to show a discriminatory purpose, the entire course of conduct is relevant.  *See Rasmy v. Marriott Int'l Inc.*, 952 F.3d 379, 388 (2d Cir. 2020).

Here, from the moment Plaintiff entered Defendant LIM's offices for an interview, Defendants subjected Plaintiff to discriminatory and harassing conduct. (Compl. ¶¶ 11-14). Delvecchio routinely abused his authority as Plaintiff's superior to sexually harass her on several occasions throughout the workday. Weeks later, the verbal sexual advances and remarks by Defendant DELVECCHIO escalated into the sexual assault of Plaintiff. This single act of sexual assault alone is sufficient to satisfy a hostile work environment claim. *See Richardson v. New York*

*State Dep't of Correctional Serv.*, 180 F.3d 426 (2d Cir. 1999) ("even a single incident of sexual assault sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment under Title VII.")

The standard for establishing a hostile work environment claim under the NYSHRL is significantly more permissive than Title VII.  Pursuant to the NYSHRL liability for a hostile work environment claim is demonstrated simply "where a plaintiff proves that he or she was treated less well than other employees because of the relevant characteristic." NYSHRL § 296(1)(h). As Plaintiff's claim meets the higher Title VII standard, she certainly succeeds under the NYSHRL standard.

## III.    DAMAGES

"Upon entry of a default, a plaintiff's claims for damages generally must be established in an evidentiary proceeding at which the defendant is afforded the opportunity to contest the amount claimed." *Cement & Concrete Workers Dist. Council Welfare Fund v. Metro Found. Constrs. Inc.*, 699 F.3d 230, 234 (2d Cir. 2012).  However, this does not require a district court to conduct a hearing and it can rely on written evidentiary submissions to determine the plaintiff's entitlement to a judgment in the amount requested.  *Bricklayers & Allied Craftworkers Local 2 v. Moulton Masonry & Constr., LLC*, 779 F.3d 182, 189 (2d Cir. 2015).  As discussed below, Plaintiff's submissions demonstrate her entitlement to back pay and emotional damages without the need for an inquest.

"Title VII [and] NYSHRL entitle a plaintiff to compensatory damages for pecuniary loss as well as pain and suffering.  Although Title VII limits the amount of damages that may be awarded, the NSYHRL [does] not.  The Title VII damages cap, therefore, does not bar compensatory damages in excess of this cap where a plaintiff pleads pendant state law claims."

*Moore v. Houlihan's Rest., Inc.*, No. 07-cv-3129, 2011 U.S. Dist. LEXIS 64452, at *13 (E.D.N.Y. May 10, 2011).

### A. Back Pay

Victims of employment discrimination are entitled to reasonable damages that would make the plaintiff "'whole for injuries suffered on account of unlawful employment discrimination.'" *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 54 (2d Cir. 1998) (quoting *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418 (1975)). Back pay is an available remedy under Title VII and the NYSHRL. *See* 42 U.S.C. § 2000e-5(g)(1); NYSHRL § 297(9); *see also Najnin v. Dollar Mt., Inc.*, No. 14-cv-5758, 2015 U.S. Dist. LEXIS 141811, at *3-*4 (S.D.N.Y. Sept. 25, 2015). "Back pay is an amount *equal to the wages* the employee would have earned from the date of discharge to the date of reinstatement[.]" *Noel v. N.Y. State Office of Mental Health Cent. N.Y. Psychiatric Ctr.*, 697 F.3d 209, 213 (2d Cir. 2012) (emphasis in original). Where, as here, reinstatement is not requested nor possible, back pay damages continue "until the date that [Plaintiff] obtains employment at which she earns the same or more money than earned at her previous job[.]" *Hamza v. Saks Fifth Ave., Inc.*, No. 07-cv-5974, 2011 U.S. Dist. LEXIS 139132, at *11-*12 (S.D.N.Y. Dec. 5, 2011). "The same standards used to award . . . back pay in Title VII discrimination cases also apply to cases arising under [the NYSRHL]." *Becerril v. E. Bronx NAACP Child Dev. Ctr.*, No. 08-cv-10283, 2009 U.S. Dist. LEXIS 76376, at *7 (S.D.N.Y. Aug. 18, 2009).

Plaintiff earned a weekly wage, salary plus commission, of $1,200 while employed by Defendants. (Pl. Decl. ¶ 3). Plaintiff remained unemployed from the date of her termination, June 19, 2020, until June 29, 2020. Multiplying Plaintiff's weekly rate of pay with Defendants of $1,200 times 1.43 weeks results in back pay damages of $1,716 for this period of time. On June 29, 2020, Plaintiff obtained employment at Surplus Furniture, where she was paid $1100 per week, or $100 less than she earned per week while employed with Defendants. (Pl. Decl. ¶ 12). That job ended

on August 9, 2020, a period of 5.86 weeks, resulting in $586 of back pay damages. Plaintiff remained out of work until August 15, 2020, or 0.86 weeks, resulting in $1,032 ($1200 x 0.86 weeks) of back pay.  From August 15, 2020, to September 15, 2020, Plaintiff worked in a similar position at Ashley Furniture, earning a weekly wage of $440, a difference of $760 per week from what she earned while under the employ of Defendants. (Pl. Decl. ¶ 13). Taking into account the 4.43 weeks covering this period, Plaintiff's back pay damages from August 15, 2020, to September 15, 2020, amount to $3,366.80. Between September 16, 2020, and October 7, 2020, Plaintiff was once again unemployed. *Id.* Thus, Plaintiff's back pay for this period totals $3,600 ($1200 x 3 weeks). As of October 7, 2020, through January 6, 2021, Plaintiff made a total of $7,500. Adjusting for the number of weeks, this comes to a weekly wage of $576.92 ($7500 / 13 weeks). Accordingly, Plaintiff's back pay damages for this period are $8,101.34 (($1,200 - $576.82) x 13 weeks). Aggregating these periods, Plaintiff's total back pay damages come to $**18,402.14**.

| Employer | Time Period Worked | Back Pay Damages |
|---|---|---|
| Defendant | May 22, 2020, to June 19, 2020 | ---------------------- |
| *Unemployed | June 19, 2020, to June 29, 2020 | $1,716 |
| New Employer #1 | June 29, 2020, to August 9, 2020 | $586 |
| *Unemployed | August 9, 2020, to August 15, 2020 | $1,032 |
| New Employer #2 | August 15, 2020, to September 15, 2020 | $3,366.80 |
| *Unemployed | September 16, 2020, to October 7, 2020 | $3,600 |
| New Employer #3 | October 7, 2020, to January 6, 2021 | $8,101.34 |

**B. Emotional Damages**

Title VII and the NYSHRL both provide for emotional distress damages. *See DeCurtis v. Upward Bound Int'l, Inc.*, No. 09-cv-5378, 2011 U.S. Dist. LEXIS 114001, at *20 (S.D.N.Y. Sept. 27, 2011). "In the Second Circuit, where a plaintiff has succeeded on Title VII and NYSHRL claims for emotional distress, courts have upheld a range of awards for compensatory damages, basing their decisions on whether [the] emotional distress claim can be categorized as 'garden-variety,' 'significant,' or 'egregious.'" *Maher v. Alliance Mortg. Banking Corp.*, No. 06-cv-5073, 2010 U.S. Dist. LEXIS 145707, at *6 (E.D.N.Y. Aug. 9, 2010). Significant emotional distress claims differ from the garden-variety claims in that they are based on more substantial harm *or more offensive conduct* [and] are sometimes supported by medical testimony and evidence." *Olsen v. County of Nassau*, 615 F. Supp. 2d 35, 46 (E.D.N.Y. 2009) (emphasis added).

As a result of her work environment, Plaintiff's emotional state changed drastically. (Pl. Decl. ¶ 5). She was frequently fearful and anxious both in her professional and personal life outside of work. (Pl. Decl. ¶ 5). This substantial effect on her mental state led directly to Plaintiff's lingering distrust of others. (Pl. Decl. ¶ 5). Plaintiff's termination only exacerbated and worsened her emotional distress. Following her termination, Plaintiff was in a constant state of severe depression and anxiety. (Pl. Decl. ¶ 8). As a result, Plaintiff completely withdrew from social interactions. (Pl. Decl. ¶ 8). Plaintiff also suffered a total loss of confidence and felt that the first job she found after her employment with Defendants, which was a substantial downgrade, was all that she deserved. (Pl. Decl. ¶¶ 8, 9, 11). Notwithstanding the absence of medical evidence, Plaintiff is nevertheless entitled to a substantial award of emotional distress damages in light of the shocking and outrageous conduct she endured. *See Antoine v. Brooklyn Maids 26, Inc.*, 489 F. Supp. 3d 68, at *98 (E.D.N.Y. Sept. 26, 2020) (finding that the Plaintiff was entitled to an award of emotional distress damages in the amount of $200,000 in a sexual assault case with no medical

evidence). Given Delvecchio's sexual assault of Plaintiff, Plaintiff requests **$200,000** in emotional damages.

### C.  Punitive Damages

Under Title VII and the NYSHRL, a prevailing party is entitled to punitive damages where defendants "engaged in intentional discrimination . . . with malice or reckless indifference to [plaintiff's] federally protected rights." *Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 384 (2d Cir. 2001). The Supreme Court has delineated several factors for courts to consider in assessing the reasonableness of punitive damages, including: "(1) *the degree of reprehensibility of the defendant's conduct*; (2) the difference between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded and the civil penalties imposed in comparable cases." *DeCurtis*, at *5 (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575, 116 S. Ct. 1589, 134 L. Ed. 2d 809 (1996) (emphasis added)).

Here, Delvecchio's sexual assault of Plaintiff is unquestionably reprehensible. Simply put, since the moment Plaintiff first interviewed Defendants, Delvecchio singled Plaintiff out and ultimately, sexually assaulted her in the workplace. As such, it is abundantly clear that Defendant Delvecchio intentionally acted with both malice and reckless indifference as to Plaintiff's protected rights and general wellbeing by sexually assaulting her. (Pl. Decl. ¶ 7). In cases involving allegations of sexual assault, courts typically award a 1:1 punitive to compensatory damages ratio. *See Antoine*, 489 F. Supp. 3d at 101-102.

Lastly, by defaulting, Defendants have surrendered the opportunity to demonstrate that their financial circumstances should constrain the amount of any such award of punitive damages. *See Mathie v. Fries,* 121 F.3d 808, 818 (2d Cir. 1997) (ruling that Under well-established precedent in this Circuit, 'it is the defendant's burden to show that his financial circumstances warrant a limitation of the award.'") (quoting *Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 373 (2d Cir.

1988)). As such, in light of the foregoing, Plaintiff respectfully requests $**200,000** in punitive damages.

### D.  Attorneys' Fees and Costs

Title VII provides for reasonable attorneys' fees and costs to the prevailing party.  *See* 42 U.S.C. § 2000e-5(k). "The Title VII and NYCHRL provisions are substantively and textually similar; therefore, the reasonableness of fees in a case would be analyzed the same way regardless of which provision provides the prevailing party's recovery." *DeCurtis*, 2011 U.S. Dist. LEXIS 114001, at *20 (internal quotations omitted).  While "[t]he district court retains discretion to determine what constitutes a reasonable fee[,]" "the product of a reasonable hourly rate and the reasonable number of hours required by the case . . . creates a presumptively reasonable fee." *Millea v. Metro-North R.R.*, 658 F.3d 154, 166 (2d Cir. 2011) (internal quotations omitted).

### i.  Reasonable Hourly Rate

In deciding whether fees and costs are reasonable, the Court must consider "what a reasonable client would be willing to pay." *Trs. of Local 813 Ins. Trust Fund v. Bradley Funeral Serv., Inc.*, No. 11-CV-2885, 2012 WL 3871759, at *5 (E.D.N.Y. Aug. 10, 2012), *report and recommendation adopted*, 2012 WL 3871755 (E.D.N.Y. Sept. 4, 2012); *see also Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, 522 F.3d 182, 183–84 (2d Cir. 2008). According to the forum rule, courts should assess the reasonableness of hourly rates by comparing the rates requested with the prevailing rates charged by attorneys practicing in the district where the court sits. *See Simmons v. N.Y.C. Transit Auth.*, 575 F.3d 170, 174–76 (2d Cir. 2009). The reasonable hourly rate determined by the court is multiplied by the number of hours reasonably expended, resulting in a "presumptively reasonable fee" or lodestar amount. *Id*. at 174. As such, in accordance with the presumptive maximum rates established by Hon. Judge Brown, Plaintiff seeks the following hourly rates for the attorneys that worked on this action: $375 for Marjorie

Mesidor, a Partner at Phillips & Associates, $295 for Joshua Friedman, an Associate at Phillips & Associates, and $295 for Joseph Myers, an Associate at Phillips & Associates.[2]

Ms. Mesidor is an experienced litigator with seventeen (17) years of experience as an attorney and thirteen (13) years litigating in the area of civil rights law.  (Friedman Decl. ¶ 7). Given this extensive experience, Plaintiff maintains that an hourly rate of $375 is reasonable and warranted.  "Recent opinions issued by courts within the Eastern District of New York have found reasonable hourly rates to be approximately $300–$450 for partners, $200–$325 for senior associates, and $100–$200 for junior associates." *Pall Corp. v. 3M Purification Inc.,* No. 97-CV-7599, 2012 WL 1979297, at *4 (E.D.N.Y. June 1, 2012) (citation and internal quotation marks omitted); *Schwartz v. United States Drug Enforcement Administration*, No. 13-CV-5004, 2019 WL 1299192, at *9 (E.D.N.Y. March 1, 2019) (awarding $500 hourly fee to partner litigating FOIA litigation, and listing awards of between $500 and $655 per hour for partners handling complex litigation), adopted by, 2019 WL 1299660 (E.D.N.Y. Mar. 21 2019) (collecting cases). Moreover, Ms. Mesidor's requested hourly rate of $375 was recently deemed reasonable in the Eastern District of New York. *See Sooroojballie v. Port Auth. of N.Y. & N.J.*, No. 15-cv-1230, 2020 U.S. Dist. LEXIS 174941, at *28 (E.D.N.Y. Sept. 22, 2020).

Mr. Friedman, who served as lead counsel in this matter, graduated from law school in 2012 and was admitted to practice in New York that same year. (Friedman Decl. ¶ 9).  Mr. Friedman has nearly ten (10) years of experience as an attorney, with over seven (7) of those years in the field of civil rights work.  (Friedman Decl. ¶ 9).  Accordingly, Plaintiff submits that a rate of $295 per hour for Mr. Friedman is eminently reasonable.  *See Pall Corp.; McLaughlin v. IDT Energy,* No. 14 CV 4107, 2018 WL 3642627, at *17 (E.D.N.Y. July 30, 2018) (finding award of

---

[2] The qualifications of each attorney and paralegal are more fully detailed in the accompanying Declaration of Joshua Friedman.

rates typical to the Eastern District and noted to be: "$550 for partners/equity owners with more than thirty years of experience, $500 for partners/equity owners with more than fifteen years of experience, $450 for partners/equity owners with more than ten years of experience, $400 for senior associates/associates with more than ten years of experience, $350 for senior associates/associates with six to nine years of experience, $300 for associates with three to five years of experience, $250 for associates with fewer than three years of experience").

Mr. Myers graduated from law school in 2014 and was admitted to practice first in Virginia in 2014 before being admitted to practice in New York in 2016.  (Friedman Decl. ¶ 11).  Mr. Myers has five (5) years of experience as an attorney and has practiced exclusively in the area of employment law since his admission to the New York bar in 2016.  (Friedman Decl. ¶ 11).  Thus, Plaintiff respectfully requests a rate of $295 per hour for Mr. Myers.  *See Konits v. Karahalis,* 409 Fed. Appx. 418, 422 (2d Cir. 2011) (Summary Order) (holding that prevailing rates for experienced attorneys in the Eastern District of New York range from approximately $300 to $400 per hour).

Mr. Pierre graduated from law school in 2021 and is currently awaiting the results of his bar exam. (Friedman Decl. ¶ 13). Mr. Pierre has nearly three (3) years of experience as a law clerk and has worked in the area of employment law for almost one (1) year. Thus, Plaintiff respectfully requests a rate of $100 per hour for Mr. Pierre. *See LG Cap. Funding, LLC v. 5Barz Int'l, Inc.*, No. 16-CV-2752 (KAM) (JO), 2019 WL 3082478, at *2 (E.D.N.Y. July 15, 2019) ("In this District, law clerks are typically awarded fees at the same hourly rate as legal paraprofessionals, or paralegals.")

Plaintiff additionally seeks hourly rates of $100 for the three paralegals who performed work on this case, Ingrid Fernandez, Candy Hernandez and Jacqueline Carranza. Paralegals in this

District are generally awarded an hourly rate of $90 to $100.  *See Douyon v. NY Medical Health Care, P.C.,* 49 F. Supp. 3d 328, 343 (E.D.N.Y. 2014) ("As to paralegals, courts in the Eastern District of New York have held that $90-$100 per hour is a reasonable fee.").  Each of the paralegals who worked on this case have significant experience and education.  Ms. Fernandez has a Bachelor's degree in Paralegal Studies and has worked as a paralegal for more than seven years.  (Friedman Decl. ¶ 14).  Ms. Fernandez is also currently pursuing her Juris Doctorate as a part-time law student.  (Friedman Decl. ¶ 15).  Similarly, Ms. Hernandez has a Bachelor's Degree in Criminal Justice and has more than seven years of experience as a paralegal.  (Friedman Decl. ¶ 16).  Finally, Ms. Carranza has worked as a paralegal and legal assistant, focusing solely in the employment law field.  (Friedman Decl. ¶ 17). Moreover, Ms. Carranza is also currently pursuing her Juris Doctorate as a part-time law student (Friedman Decl. ¶ 18).  Accordingly, Plaintiff submits that an hourly rate of $100 is justified.  "Recently, reasonable hourly rates in this district have ranged from . . . $70– $100 for paralegals." *Ferrara v. Prof'l Pavers Corp*., No. 11-CV-1433, 2013 WL 1212816, at *5 (E.D.N.Y. Mar. 23, 2013) (surveying cases and utilizing a rate of $100 per hour for paralegal).

### ii.  Number of Hours Reasonably Expended

Parties seeking attorneys' fees bear the burden of demonstrating the reasonableness of both the hours expended and the type of work performed. They typically do this through contemporaneous time records, preferably those specifying the nature of the work performed, the hours spent, and the dates on which the work was done. *New York State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1147–48 (2d Cir. 1983). The level of detail need not be overly exhaustive, however. *See Aiello v. Town of Brookhaven*, No. 94-CV-2622, 2005 WL 1397202, at *2 (E.D.N.Y. June 13, 2005). "District courts have broad discretion to determine the

reasonableness of hours claimed based on their general experience and 'familiarity with the case.'" *Brady v. Wal-Mart Stores, Inc.*, No. 03-CV-3843, 2010 WL 4392566, (E.D.N.Y. Oct. 29, 2010) at *6 (quoting *Murray v. Mills*, 354 F. Supp. 2d 231, 238 (E.D.N.Y. 2005)). In determining whether an award is reasonable, the District Court must review and eliminate hours that are found to be "excessive, redundant, or otherwise unnecessary." *Hensley v. Eckhart*, 461 U.S. 424, 434, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983).

Here, Plaintiff seeks 34.39 hours, which are supported by contemporaneous time records showing the date and time the work was performed and a description of the work done. (Friedman Decl. ¶ 3; Ex. A). Moreover, Plaintiff has removed any time that could even arguably be considered unnecessary and duplicative. (Friedman Decl. ¶ 4). This number of hours is in line with other decisions approving a similar number of hours. *See Villarrubia v. La Hoguera Paisa Restaurant & Bakery Corp.,* 2020 U.S. Dist. LEXIS 46072 (E.D.N.Y. Oct. 9, 2020) (finding that 35.45 hours reasonable).

The following chart sets forth the number of hours expended by each attorney and paralegal who worked on this case:

| | |
|---|---:|
| Marjorie Mesidor, Esq. | .9 |
| Joshua Friedman, Esq. | 1.3 |
| Joseph Myers, Esq. | 5.3 |
| Dane Pierre | 11.9 |
| Ingrid Fernandez | 11.1 |
| Jacqueline Carranza | 1.3 |
| Candy Hernandez | 2.59 |
| **Total** | 34.39 |

(Friedman Decl. ¶ 5).  Taking into account the rates requested for each entrant set forth above, Plaintiff seeks the following amount of attorneys' fees:

| | |
|---|---|
| Marjorie Mesidor, Esq. | $337.50 ($375/hr. x 0.9 hours) |
| Joshua Friedman, Esq. | $383.50 ($295/hr. x 1.3 hours) |
| Joseph Myers, Esq. | $1,563.50 ($295/hr. x 5.3 hours) |
| Dane Pierre | $1,190.00 ($100/hr. x 11.9 hours) |
| Ingrid Fernandez | $1,110.00 ($100/hr. x 11.1 hours) |
| Candy Hernandez | $259.00 ($100/hr. x 2.59 hours) |
| Jacqueline Carranza | $130.00 ($100/hr. x 1.3 hours) |
| **Total** | **$4,973.50** |

(Friedman Decl. ¶ 20).

### iii. Costs

"Attorney's fees awards include those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients."  *United States Football League v. National Football League*, 887 F.2d 408, 416 (2d Cir. 1989).  Here, Plaintiff seeks $**585.52** in costs, which represent a single FedEx mailing fee, the court filing fee and process server fees.  (Friedman Decl. ¶ 21; Exs. B, C, D).  Therefore, in total, Plaintiff requests an award of $6,419.52 in attorneys' fees and costs.

### **CONCLUSION**

Wherefore, for the foregoing reasons, Plaintiff respectfully requests that the Court grant Plaintiff's motion for default judgment and enter judgment for Plaintiff in the amount of **$423,961.16**

Dated:  Garden City, New York
        October 25, 2021

PHILLIPS & ASSOCIATES,
ATTORNEYS AT LAW, PLLC

By:       /s/

Joshua Friedman, Esq.
*Attorneys for Plaintiff*
585 Stewart Avenue, Suite 410
Garden City, New York 11530
(212) 248-7431
jfriedman@tgplaws.com

19