UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

JANE DOE,

                          Plaintiff,            **REPORT & RECCOMMENDATION**

      v.                                      21-cv-1232 (GRB) (ST)

LONG ISLAND MOTORS, INC.,
and DAVID DELVECCHIO,

                          Defendants.
-----------------------------------------------------------X
**TISCIONE, United States Magistrate Judge:**

## INTRODUCTION

       This case arises out of repeated sexual harassment and a sexual assault Plaintiff suffered at her place of work.  Default judgment has already been entered against Defendants on Plaintiff's claims of sex discrimination in employment under Title VII of the Civil Rights Act of 1964, sex discrimination in employment under the New York State Human Rights Law, and gender discrimination in employment under the Suffolk County Human Rights Law.  The Hon. Gary Brown has awarded Plaintiff $23,961.16 in back pay, attorneys' fees, and costs. Def. Judg., ECF No. 18.  The issues remaining in this case are: (1) the appropriate amount of emotional distress damages and (2) the appropriate amount of punitive damages Plaintiff should be awarded.  Those issues were referred to me for a Report and Recommendation.  A damages inquest was held.  Defendants did not appear.  During the inquest, Plaintiff and her mother detailed the damages she suffered due to the acts of Defendants.  For the reasons detailed below, I recommend $175,000 in emotional distress damages and $125,000 in punitive damages be assessed against Defendants.

1

## BACKGROUND

Plaintiff was injured when she was repeatedly sexual harassed and, in one instance, sexually assaulted at Long Island Motors while employed there.

On or around May 17, 2020, Plaintiff was invited to interview with Long Island Motors for a job she had applied for. Pl. Compl. ¶ 11. The next day, she met with David Delvecchio, a supervisor at Long Island Motors and one of the defendants in this action, who conducted that interview. *Id.* at ¶ 12. As Plaintiff sat down, her purse brushed against her blouse, pulling it up and revealing a tattoo on her stomach. *Id.* at ¶ 13. Delvecchio said, "Wow, you have nice tattoos, can I see them all?" which Plaintiff brushed off. *Id.* at ¶ 14. Plaintiff testified that this comment made her feel uncomfortable. Inq. Tr., 9, ECF No. 24. After the interview, Plaintiff was hired by Defendants as a sales specialist at Long Island Motors. Pl. Compl. ¶ 15.

On her first day, Plaintiff had a discussion with Joanne Peppaceno, the finance supervisor at Long Island Motors. *Id.* at ¶ 16. During that discussion, she asked if Peppaceno would keep an eye on Delvecchio because he "creeped [Plaintiff] out." *Id.* at ¶ 17. Peppaceno said, "I always knew he liked black girls," and told Plaintiff she had nothing to worry about. *Id.* Later that same day, Delvecchio called Plaintiff into his office and asked her to go to lunch with him, saying he would "show her a good time." *Id.* at ¶ 18. Plaintiff testified at the inquest that these types of suggestive comments were made to her by Delvecchio approximately three times a week. Inq. Tr., 12.

By June of 2020, Delvecchio would call Plaintiff in to his office 10-15 times per day on minor matters. Plaintiff's co-workers began to notice and comment on this unusually high level of attention. Pl. Compl. ¶ 19. Plaintiff said the attention and comments from Delvecchio "started taking a toll" on her, and she began to ignore Delvecchio when he would make suggestive

comments and became standoffish towards him. Inq. Tr., 15. She began to not want to smile and lost her appetite. *Id.*

During one of her trips into Delvecchio's office, Plaintiff noticed Delvecchio had a panel of screens behind his desk which showed feeds from three surveillance cameras located around the dealership. One of those feeds was from a surveillance camera which Plaintiff noticed faced her desk. Pl. Compl. ¶¶ 20-21. She says when she noticed that camera she, "felt very uncomfortable," "sick," and "confused." Inq. Tr., 17. Her "anxiety was going a mile a minute." *Id.* She began wearing a hat to work in response, which Delvecchio forbade her from doing after a few hours. Pl. Compl. ¶¶ 22-23.

In or around early June of 2020, Delvecchio told Plaintiff, "If I were given the chance, I would go down on you," referring, Plaintiff assumed, to performing oral sex on her. Plaintiff responded with a joke in an attempt to defuse the situation. *Id.* at ¶ 24; Inq. Tr., 13. She said the proposition made her feel very uncomfortable, disgusted, and "violated as a woman." Inq. Tr., 13. It was at this point, Plaintiff testified, that she began to start feeling sick, both internally and mentally. *Id.* The constant harassment also began to cause an increase in Plaintiff's anxiety. *Id.* at 15.

Plaintiff told another employee named Jemima about Delvecchio's comment regarding "going down on" Plaintiff. *Id* at ¶ 28. Jemima, during the course of the discussion, proclaimed loudly to the office, "Tell everyone how you told me David [Delvecchio] has been hitting on you…" *Id.* at ¶ 30. Delvecchio heard the exchange, called Plaintiff into his office, and questioned her regarding what she had been telling the other employees. *Id.* at ¶ 31. He told Plaintiff, "Everyone here has a problem with you…If you have issues with Jemima, I will fire you before I fire her." *Id.* at ¶ 33.

The following day, Delvecchio called an all-staff meeting during which several co-workers made comments about Plaintiff. *Id.* at ¶ 35. Plaintiff felt defeated after the meeting and apologized to her co-workers. *Id.* at ¶ 36.

Later that same day, Delvecchio called Plaintiff into his office. He again asked Plaintiff what she was telling people. Plaintiff was afraid of losing her job and responded, "I said you were cool, and I liked you." Delvecchio told Plaintiff to sit down. He said, "So you like me?" while he unzipped his pants and removed his penis, beginning to stroke it. *Id.* at ¶¶ 37-41.

Delvecchio demanded Plaintiff come to his side of the desk. Plaintiff, terrified, obeyed. Delvecchio said, "Baby, tell me what you want." Plaintiff pleaded that she just wanted her job. *Id.* at ¶¶ 41-43.

Delvecchio began to rub Plaintiff's buttocks with his left hand as he continued to stroke his penis with his right. Plaintiff exclaimed, "What are you doing…" Plaintiff told Delvecchio she was menstruating in an attempt to escape the situation. Delvecchio told her he did not care. Delvecchio grabbed Plaintiff's hand, and placed it on his penis, then forcibly stroked his penis with Plaintiff's hand. Delvecchio slid his other hand inside Plaintiff's pants and digitally penetrated her anus while asking her if she, "liked it." Plaintiff felt powerless as this sexual assault occurred. Within minutes, Delvecchio ejaculated onto her hand. *Id.* at ¶¶ 44-49.

Plaintiff testified at the inquest hearing that the during the assault, she felt "scared[,]…sad[,]…manipulated[,]… humiliated[,]…[and] very disgusted…" Inq. Tr., 30. She said she "was actually undergoing a panic attack" during the assault and was left "very disturbed." *Id.* After the assault, Plaintiff walked to the bathroom and vomited. Pl. Compl. ¶ 50. She testified she vomited because her "heart was pumping. [She] was getting nauseous. [She] felt humiliated. [She] felt very disgusted. [She] felt depressed. [She] felt mentally damaged

4

internally, physically. [She] felt violated just as a woman." Inq. Tr., 30. She returned to her car and had to use her asthma pump for her anxiety. *Id.* at 32, 36.

She said these physical and mental symptoms were the result of her feeling, "like [she] failed as a person, as a female, because [she] wanted to work." *Id.* at 31. Plaintiff testified, "I'd been out of work for so long. And I felt like everything I was trying to do wasn't working in my favor. I felt hopeless. And I really felt like I failed as a mom and as a daughter to my mom because I had to find a way to explain everything. I felt – I really did feel humiliated, very disgusted." *Id.*

Several days later, during a meeting with Peppaceno, Plaintiff told her that Delvecchio had told Plaintiff that he could report Peppaceno for yelling at Plaintiff in front of customers during an earlier incident. Delvecchio then appeared and asked Plaintiff to take his daughter's car for inspection. Plaintiff observed Delvecchio and Peppaceno get into a heated argument, after which Delvecchio fired Plaintiff and screamed at her, "…All you do is run your mouth, I don't want you working here anymore!...I will fuck your background up, I will make sure you never work for another company again!" Plaintiff felt humiliated and left the dealership. Pl. Compl. ¶¶ 53-59. Plaintiff testified that after being fired, she had to again use her asthma pump for her anxiety. She said, "I started feeling sick again, anxiety, confused. I was depressed. At this time, I was shaking. I was very shaky…I wasn't breathing how I supposed to breathe. I started like gasping." Inq. Tr., 36-37.

That night, Plaintiff went home and told her mother about the harassment and assault. Plaintiff's mother said Plaintiff, "Didn't look like herself…She was afraid. She was angry. And then she was kind of like blaming herself. It was like – and I just explained to her this is not your fault. And she constantly cried. She was very angry. Very upset. She couldn't really get the

words out. So it was like an all-nighter. And I haven't slept in my daughter's bed in years. I slept with her. I hold [*sic*] her. We talked and talked…She couldn't sleep at all." *Id.* at 56-57. Plaintiff's mother testified she went into the office with Plaintiff the next day to collect her things and went with her to the police station to file an incident report. *Id.* at 61-62.

The inquest revealed the harassment and assault left Plaintiff with physical and emotional damage.  Plaintiff's mother testified that Plaintiff "just shut down. She shut down a lot in almost like a year." *Id.* at 53.  Plaintiff testified she lost weight while working at Long Island Motors. She said she stopped eating her second week on the job. *Id.* at 31-32.  She testified at the time of inquest she weighed 175 pounds.  But while at LIM, her weight dropped to 140 pounds. *Id.* at 31. Her mother testified that Plaintiff, "Lost so much weight. She wasn't eating. I had to buy her Nutriment…that's like a drink that will help you, you know, keep vitamins in your body…She didn't have an appetite…she was getting very fragile and she was beginning to look very sick…" *Id.* at 57-58.

Plaintiff also cut off most of her hair as a result of the trauma she suffered.  She testified after the harassment and assault she cut between sixteen and eighteen inches of her hair off. *Id.* at 38.  She said she kept approximately 3 inches of hair remaining. *Id.*  She explained, "This wasn't like a one cut thing. I actually was cutting my hair all the way to August…I felt like I was starting over. Reborn. Just feeling like I was starting over a new journey…" *Id.* at 38.  She also testified, "I thought if I like changed my appearance – so I didn't wear makeup anymore…I told my mom, you know, maybe if I stop looking attractive, I guess maybe people will leave me alone. I changed my whole look and cut off my hair." *Id.* at 48.  She added, "Before I loved my hair. My hair was everything, you know. And I cut it off and I started just hiding under wigs and

stuff. So I had no hair. And I didn't want to be liked. I didn't want to bring any attention." *Id.* at 49.

Plaintiff's mother also commented on Plaintiff's hair. She said, "I noticed a change. [Plaintiff] started cutting her hair. [Plaintiff] didn't care about her appearance. And I was aware that [Plaintiff] was coping with something when [Plaintiff] was not caring about her appearance. She wanted to feel ugly. She really wanted to feel ugly." *Id.* at 53.

Plaintiff also testified the ordeal affected her personality. "I'm not as happy. I'm not as jolly. I'm not doing my music. I'm not writing any music. I started losing myself…I wasn't happy at all. Still very much disgusted. I was devastated. I wasn't me." *Id.* Plaintiff's mother said she noticed Plaintiff stopped taking part in activities that she had enjoyed before. *Id.* at 59-60.

Plaintiff also testified the experience has affected her at subsequent jobs at dealerships: "…[E]very day I go to a dealership and I'm always reminded. Even in a great atmosphere. Because my first job of trying to start a new career was at Long Island Motors and it haunts me now, you know." *Id.* at 48.  She added, "I'm leaving jobs…just so I could feel safe because I didn't ask for any of this stuff. I just wanted to work." *Id.* at 50.  Her mother testified that Plaintiff had, "…[A] lot of anxiety." *Id.* at 62.

When asked how severe she would describe her symptoms during the ordeal on a scale of one to ten, Plaintiff said, "Ten." *Id.* at 47.

## LEGAL STANDARD

Allegations of liability are admitted upon default, but allegations of damages are not. *Greyhound Exhibitgroup v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992).  Even upon default judgment, a court still has a duty to ensure there is a basis for the damages Plaintiff seeks.

7

*Fustok v. Conticommodity Services, Inc.*, 873 F.2d 38, 40 (2d Cir. 1989). That determination may be made upon evidence presented at a hearing, such as the inquest that took place in this case. *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 111 (2d Cir. 1997). The damages to be awarded must be ascertained "with reasonable certainty." *Styka v. My Merchs. Serv. LLC*, No. 14-CV-6198, 2016 U.S. Dist. LEXIS 34238, *11 (E.D.N.Y. Mar. 15, 2016) (quoting *Credit Lyonnais Sec., Inc. v. Alcantarea,* 183 F.3d 151, 155 (2d Cir. 1999)) (*adopted by* 2016 U.S. Dist. LEXIS 90977 (E.D.N.Y. June 28, 2016)).

While Title VII sets a cap on the total amount of damages, the NYSHRL does not. *See* 42 U.S.C. § 1981a(b)(3); *Moore v. Houlihan's Rest., Inc.*, 07-CV-3129, 2011 U.S. Dist. LEXIS 64452, 2011 WL 2470023, at *4 (E.D.N.Y. May 10, 2011) (*adopted by* 2011 U.S. Dist. LEXIS 64447, 2011 WL 2462194 (E.D.N.Y. June 17, 2011)). Therefore, where a plaintiff pleads pendant state law claims, such as here, the Title VII damages cap does not bar compensatory damages in excess of it. *Id.* Title VII and the NYSHRL permit recovery of punitive damages in situations like this. 42 U.S.C. § 1981a(a)(1); N.Y. C.L.S. Exec. §297(9). Punitive damages under Title VII are subject to its damages cap. 42 U.S.C. § 1981a(b)(3). The NYSHRL does not textually cap punitive damage awards. *See* N.Y. C.L.S. Exec. §297(9).

Here, the Court relies primarily upon Plaintiff's testimony at the inquest, Plaintiff's mother's testimony at the inquest, and Plaintiff's complaint to resolve the only questions remaining: the amount of emotional distress and punitive damages, if any, that Plaintiff should be awarded.

## DISCUSSION

I. **Emotional Distress Damages**

    a. **Plaintiff's Emotional Distress Damage Claims Are "Egregious"**

8

In the Second Circuit, emotional distress damage claims are grouped into three categories, each with varying ranges of appropriate damages: garden-variety, significant, and egregious. *Rainone v. Potter*, 388 F. Supp. 2d 120, 122 (E.D.N.Y. 2005).

Adjusting the values for inflation, courts have awarded damages ranging from $6,500 to $46,000 for garden-variety claims, which have been classified as cases where the plaintiff "did not seek medical treatment but [] the evidence in the form of plaintiff's testimony describes shock, nightmares, sleeplessness, humiliation, and other subjective distress." *Antoine v. Brooklyn Maids 26, Inc.,* 489 F. Supp. 3d 68, 96 (E.D.N.Y. 2020) (quoting *Santiago v. Crown Heights Ctr. For Nursing & Rehab,* No. 15-CV-4381, 2017 U.S. Dist. LEXIS 27356, 2017 WL 9482107, *23 (E.D.N.Y. Feb. 24, 2017)).

"Significant" claims are ones "where a plaintiff has suffered 'more substantial harm, usually evidenced through medical testimony or documentation.'" *Antoine,* 489 F. Supp. 3d at 96 (quoting *Joseph v. HDMJ Rest. Inc.,* 970 F. Supp. 2d 131, 153 (E.D.N.Y. 2013)). When adjusted for inflation, courts have awarded between $65,000 and $131,000 for these types of cases. *Antoine,* 489 F. Supp. 3d at 97.

Finally, "egregious" claims are those "where the discriminatory conduct was outrageous and shocking or where the physical health of plaintiff was significantly altered." *Rainone*, 388 F. Supp. 2d at 123.  In such cases, adjusted for inflation, courts have awarded in excess of $131,000 in emotional distress damages. *Antoine,* 489 F. Supp. 3d at 97.

Plaintiff requests "a significant emotional distress damages award in excess of 'six figures.'" Pl. Br., 4, ECF No. 23.

I recommend the Court find this is an "egregious" case.  Delvecchio's conduct towards Plaintiff was outrageous and shocking.  While in a place of work, and while acting as Plaintiff's

9

superior, he asked to see all Plaintiff's tattoos (Pl. Compl. ¶ 14), told her he could "show her a good time" (¶ 18), told her "if given the chance, I would go down on you" (¶ 28), observed her via security cameras from his desk (¶¶ 20-23), exposed his penis in his office after calling Plaintiff in (¶ 40), forced Plaintiff to stroke his penis until ejaculation (¶ 47), and digitally penetrated her anus without her consent (¶ 48). Delvecchio's actions caused Plaintiff to feel uncomfortable (Inq. Tr., 9, 13), disgusted (*id.* at 13, 31, 32, 47), manipulated (*id.* at 30, 32), humiliated (*id.* at 30, 31), depressed (*id.* at 36, 37, 47), sick both physically and mentally (*id.* at 13, 30), to lose her appetite and stop eating (*id.* at 15, 31-32, 47), to suffer substantial weight loss (*id.* at 31), to suffer anxiety attacks (*it.* at 17, 30, 32, 36-37), to cut her hair in a desire to herself less appealing (*id.* at 37-39, 47, 49), and to lose interest in things that once brought her joy (*id.* at 48, 49).

While Plaintiff did not present medical testimony or documentation to support her claims, she did present a corroborating witness. Her mother confirmed the emotional distress she suffered, noting that Plaintiff's personality changed and she began losing interest in things that once brought her joy (*id.* at 52-53, 59-60), Plaintiff cut her hair because she "wanted to feel ugly" (*id.* at 53, 62), Plaintiff "constantly cried" (*id.* at 56), Plaintiff was "very upset" (*id.*), Plaintiff was not sleeping (*id.* at 57), Plaintiff was not eating (*id.*), Plaintiff had lost substantial weight to the point where her mother was asking her to drink vitamin supplements (*id.* at 57-58), Plaintiff looked "zoned out" (*id.* at 58), and Plaintiff had "a lot of anxiety" (*id.* at 62).

Delvecchio's outrageous and shocking behavior led to emotional distress that greatly exceeded subjective symptoms. Thus, I recommend the court find these emotional distress damage claims fall in the "egregious" category.

      b.      **Similar Cases Support a Large Emotional Distress Award**

In her brief, Plaintiff cites to numerous cases with varying emotional distress awards in cases where the plaintiff experienced some similar physical and mental symptoms to provide context for the court in assessing the appropriate amount for emotional distress damages in this case. But Plaintiff did not note in her brief what about the cases cited made them similar to what Plaintiff experienced, aside from the fact that the court in each case used similar descriptors of the plaintiffs' symptoms. Indeed, only one of the cases offered by Plaintiff involved emotional distress damages from sexual harassment and none were related to emotional distress damages caused by a sexual assault. Additionally, the cases offered by Plaintiff vary in terms of the how many professed symptoms overlapped with those of the Plaintiff, the severity of those symptoms, the amount of time each Plaintiff was subjected to discrimination, and the level of corroboration each plaintiff had of their symptoms and the cause of those symptoms, all of which factor into an assessment of emotional distress damages.

However, I have found and analyzed some recent opinions of this Court in which the degree of the harms suffered and symptoms expressed are more analogous to Plaintiff's. I will summarize and discuss those below.

In *Antoine v. Brooklyn Maids 26*, the plaintiff, who was a housekeeper employee for defendant Brooklyn Maids, was awarded $200,000 in emotional distress damages by this Court. 489 F. Supp. 3d at 68. James Henestroza, defendant and CEO of Brooklyn Maids, asked the plaintiff to clean his apartment. While in his apartment, Henestroza brought the plaintiff into his bedroom, told her, "this is where the magic happens," and asked her about her sexual history and what kinds of sex acts she enjoyed. After the plaintiff left, Henestroza sent her text messages conveying his romantic interest and describing the size of his penis. The plaintiff rebuffed his advances.

11

Later, Henestroza accompanied her on a different apartment-cleaning assignment. As the plaintiff was working, Henestroza locked the apartment door, pressured her to have sex, and then pushed her on the bed and coerced her into having sex. Afterwards, the plaintiff again told Henestroza she was not interested in him sexually, and he withheld her pay. When she attempted to collect it, Henestroza threw the plaintiff against a wall and choked her. *Id.* at 78-79. Henestroza followed her to her house. Fearful for her safety, she moved into domestic violence shelters. The ordeal caused the plaintiff stress, loss of sleep, and loss of a significant amount of weight. She was diagnosed with anxiety, bipolar disorder, trauma, post-traumatic stress syndrome, and significant depression. *Id.* at 98.

This Court found Mr. Henestroza's conduct egregious and put Plaintiff's emotional distress claims in the highest category. The Court did note however that the lack of "corroborating evidence regarding plaintiff's mental health diagnoses, medications, and other factors" prevented it from providing "a more significant award of damages for emotional distress." *Id.* at 99. Among the missing corroborating evidence was no "corroborating witness at the inquest." *Id.*

Here, while Defendant's conduct was patently egregious, and Plaintiff suffered severe emotional trauma, Plaintiff did not have to leave her home and seek shelter in domestic violence shelters and did not testify that she was diagnosed with mental health conditions by a licensed professional as a result of Defendants' conduct. However, unlike in *Antoine*, Plaintiff did present a corroborating witness at the inquest. And Plaintiff suffered many, though not all, of the harms the plaintiff in *Antoine* did. All this indicates that, while Plaintiff's emotional distress award should be lower than in *Antoine,* it should not be substantially lower.

*Styka v. My Merchs. Servs. LLC* is another somewhat analogous case. 2016 U.S. Dist. LEXIS 34238. In *Styka*, the plaintiff was an employee who was sexually harassed and assaulted by her supervisor while at work. While working for five months at My Merchant Services, the plaintiff worked near the defendant, Jose Valerios, her supervisor. Starting at one month into her employment, Valerios would direct sexual comments at the plaintiff daily, telling her he wanted to touch and have sex with the plaintiff. His behavior escalated to assaults on several occasions, when he: pushed the plaintiff onto an elevator and inappropriately groped and touched her, inappropriately grabbed her in a hallway, grabbed her legs and thighs twice when she was alone with him, and attempted to grab and kiss her on several occasions. The plaintiff testified that, due to Valerios' conduct, she had trouble getting out of bed in the morning, experienced fluctuations in her weight, had feelings of helplessness, hopelessness, and worthlessness, had trouble sleeping, felt violated and as if she were "nothing" or a "piece of meat" and sought psychiatric help for her symptoms. This Court awarded her $120,000 in emotional distress damages. In doing so, the Court noted that no corroborating witness was presented and "while the symptoms have persisted, Plaintiff's employment was brief, [and] Plaintiff was also experiencing other life events that caused her to experience distress. Accordingly, based on Plaintiff's submissions and testimony, the severity and intensity of Mr. Valerios' sexually harassing behavior, the brief duration of her employment, and the continuation of Plaintiff's symptoms…the Court respectfully recommends…the upward limit for significant claims…" *Id.* at *16.

While there are similarities here with *Styka* (the duration of employment, the constant sexual harassment, some of the emotional distress symptoms suffered), there are also significant differences. First and foremost, unlike *Styka,* I recommend placing this case in the egregious

13

category because of how much more egregious Defendant's conduct, which included forcing Plaintiff to stroke his penis and digitally penetrating Plaintiff's anus against her will, was. Additionally, Plaintiff in this case, unlike in *Styka*, presented a corroborating witness. And, while Plaintiff here did not testify she sought psychiatric treatment, she did seek assistance with her symptoms from her mother, who is a licensed social worker and attended schooling for psychology. Inq. Tr., 63-64. Additionally, there was no evidence presented at the inquest that Plaintiff had any of the symptoms she described prior to her employment at Long Island Motors, unlike the plaintiff in *Styka*. All of this is indicative that the award given to Plaintiff in this case should be higher than in *Styka*.

Then there is *Gutierrez v. Taxi Club Mgmt.,* a case in which the plaintiff was persistently sexually harassed at work by her superior. No. 17-CV-532, 2018 U.S. Dist. LEXIS 106808 (E.D.N.Y. June 15, 2018). This harassment continued for almost a year before the plaintiff was terminated. This Court awarded the plaintiff in that case $130,000 in emotional distress damages based on "Plaintiff's submissions and testimony, the severity and intensity of [Defendant's] sexually harassing behavior, [and] the continuation of Plaintiff's symptoms after termination of her employment." *Id.* at *23-24. However, the plaintiff was not subject to a sexual assault in *Gutierrez*, and the Court did not find the defendant's conduct egregious in that case, merely awarding "significant" damages. Moreover, in *Gutierrez,* the plaintiff's emotional damages were only corroborated by her own testimony, whereas, here, Plaintiff offered a corroborating witness. *Id.* at *23. All of this indicates Plaintiff's award should be higher than that in *Gutierrez.*

   **c.**  **Plaintiff Is Entitled to $175,000 In Emotional Distress Damages**

Taking everything into consideration: the egregiousness of Defendant's conduct and the severity of the assault upon Plaintiff, Plaintiff's corroborating witness, Plaintiff's testimony that

14

her symptoms were very severe, the short duration of her employment, the absence of evidence of a mental health diagnosis, and the continuation of her symptoms to this day from the conduct of Defendants, I recommend the Court award Plaintiff $175,000 in emotional distress damages. This is more than in *Gutierrez* because the assault upon Plaintiff made this an egregious and not merely significant claim and because a corroborating witness was presented, but slightly less than *Antoine* because Plaintiff did not testify to any mental health diagnoses and was not forced to leave her home for fear of her own safety.

Plaintiff's testimony and her mother's testimony at the inquest made it clear that Plaintiff went through a terrible ordeal and that Plaintiff was egregiously harmed as a result of it. Therefore, assessing her damages based on her testimony and similar cases, I recommend the Court find she is entitled to $175,000 in emotional distress damages.

## II.     Punitive Damages

### a.     Punitive Damages Are Available to Plaintiff Under the NYSHRL

Plaintiff also seeks a "significant punitive damage award." Pl. Br., 4.

Under Title VII, punitive damages are available where "the employer has engaged in intentional discrimination and has done so 'with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'" *Zimmerman v. Assocs. First Capital Corp.,* 251 F.3d 376, 384 (2d Cir. 2001) (citing *Kolstad v. American Dental Ass'n,* 527 U.S. 526, 529-30 (1999)) (quoting 42 U.S.C. §1981a(b)(1)). Additionally, punitive damages liability may be imposed upon an employer for the malicious or recklessly indifferent discrimination of its agents "where an employee serving in a 'managerial capacity' committed the wrong while 'acting in the scope of his employment'." *Zimmerman,* 251 F.3d at 384-85 (citing *Kolstad,* 527 U.S. at 543).

However, damages under Title VII are capped. The statute provides that, "The sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section, shall not exceed, for each complaining party…" amounts delineated by the number of employees the defendant has. 42 U.S.C. §1981a(b)(3).  With the award of $175,000 in compensatory damages, the Court could only award additional punitive damages under Title VII if Long Island Motors employed 201 or more employees.  Plaintiff has not put into the record evidence that Long Island Motors has that many employees and so the Court cannot find a basis for punitive damages under Title VII, regardless of how the Court would rule on Defendants' malice or reckless indifference.

However, while the NYSHRL once did not allow for punitive damages in cases like this, it was amended to permit punitive damages "in cases of employment discrimination related to private employers…" N.Y. C.L.S. Exec. §297(9).  There is no limit on these punitive damages under the NYSHRL.  Thus, the Court may assess punitive damages under the NYSHRL provided the legal standard is met.

### b.       Defendants Are Subject to Punitive Damages for Delvecchio's Conduct

The U.S. Supreme Court has held states may impose punitive damages "to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition." *BMW of N. Am. v. Gore,* 517 U.S. 559, 568 (1996).  In assessing the reasonableness of punitive damages, there are several factors courts must consider: "(1) the degree of reprehensibility of the defendant's conduct; (2) the difference between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded and the civil penalties imposed in comparable cases." *Zimmerman,* 489 F. Supp. at 101

16

(quoting *DeCurtis v. Upward Bound Int'l Inc.,* 09-CV-5378, 2011 U.S. Dist. LEXIS 114001, 2011 WL 4549412, *5 (S.D.N.Y. Sept. 27, 2011)).

Delvecchio's conduct certainly was reprehensible.  His direction of persistent lude and harassing comments at Plaintiff in the workplace was itself highly problematic.  But add on to that sexual assaulting Plaintiff in his office, and his conduct is unquestionably of the unlawful type the New York State legislature would wish to deter with punitive damages.  His persistent unsolicited advances on Plaintiff, placing and manipulating Plaintiff's hand on his penis, and forcing his digit into Plaintiff's anus, all at their place of work and while acting as Plaintiff's supervisor, evinced malice and a complete disregard for the rights of Plaintiff as a woman, an employee, and a human being.  Indeed, as in *Antoine,* Delvecchio's conduct was reprehensible as he "abused his position of trust for unseemly, if not illegal, ends." *Antoine,* 489 F. Supp. 3d at 101.  It is, thus, eminently reasonable to impose punitive damages under the NYSHRL to "punish [Defendants] appropriately for [their] misconduct." *See Payne v. Jones,* 711 F.3d 85, 93 (2d Cir. 2013).

      **c.**      **Plaintiff is Entitled to $125,000 in Punitive Damages**

In considering the other two factors of the Supreme Court's analysis, I look to similar precedent.  Given the recency of the amendment to the NYSHRL, there is not much case law guiding courts on how to assess the appropriate amount of punitive damages under that statute.  However, courts in this Circuit have routinely assessed punitive damages in similar cases under the rubric of Title VII and pendant New York City Human Rights Law claims and, given the similarity of the NYCHRL and NYSHRL employment discrimination punitive damage provisions, this guidance is useful in assessing punitive damages under the NYSHRL in this case. *See* N.Y. Admin. Code. § 8-502(a).

17

In Title VII sexual assault cases with pendant NYCHRL claims, "courts in this Circuit frequently award punitive damages that are equal to or less than compensatory damages." *Antoine,* 489 F. Supp. 3d at 101 (collecting cases).  In comparable cases where punitive damages were imposed, courts in this Circuit have awarded $200,000 where a defendant corrections officer sexually abused and sodomized an inmate, $100,000 in punitive damages for a one-time sexual assault, $150,000 where a corrections officer raped an inmate, $200,000 to a victim of date rape, and $375,000 in *Antoine* where the plaintiff was raped, choked, and driven into hiding. *See Mathie v. Fries,* 121 F.3d 808 (2d Cir. 1997); *Offei v. Mahmoud Abdel-Salam Omar,* 11-CV-4283, 2012 U.S. Dist. LEXIS 80171, 2012 WL 2086294 (S.D.N.Y. May 18, 2012) (*adopted by* 2012 U.S. Dist. LEXIS 80144); *Cash v. County of Erie,* 04-CV-182, 2009 U.S. Dist. LEXIS 91232, 2009 WL 3199558 (W.D.N.Y. 2009); *Deborah S. v. Diorio,* 583 N.Y.S.2d 872 (N.Y. Civ. Ct. 1992); *Antoine,* 489 F. Supp 3d at 102.

Given this range, I recommend the Court find $125,000 is appropriate for punitive damages here.  Delvecchio's conduct was sustained, egregious, brazen, and worthy of substantial punishment and deterrence.  While Plaintiff was not subject to rape or repeated assaults as some of the plaintiffs in these cases were, she was still subject to a very serious sexual assault that included penetration by one of the Defendant's digits and a sustained pattern of sexual harassment prior to that assault.  As such, while this punitive damage award is slightly lower than in cases of rape by corrections officers, it is not much lower given the severity of Defendants' conduct.  It also is lower than the compensatory damages awarded, as is customary in this Circuit in sexual assault cases.

Additionally, while the Court is required to take into account Defendants' ability to pay, Defendants have the burden to show their financial circumstances require limitation of the

award. *Smith v. Lightning Bolt Prods., Inc.,* 861 F.2d 363, 373 (2d Cir. 1988). The defaulting Defendants have not provided any evidence of financial circumstances and, thus, the Court should not consider them.

## CONCLUSION

For the reasons discussed, I recommend the Court award Plaintiff $175,000 in emotional distress damages and $125,000 in punitive damages.

## OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections. Failure to file timely objections shall constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. *See Frydman v. Experian Info. Sols., Inc.*, 743 F. App'x 486, 487 (2d Cir. 2018); *McConnell v. ABC-Amega, Inc.*, 338 F. App'x 24, 26 (2d Cir. 2009); *Tavarez v. Berryhill*, No. 15-CV-5141 (CS) (LMS), 2019 WL 1965832, at *30 (S.D.N.Y. May 1, 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).

**SO ORDERED.**

                                                  /s/
                                         Steven L. Tiscione
                                         United States Magistrate Judge
                                         Eastern District of New York

Dated: Central Islip, New York
        June 8, 2022